NOT DESIGNATED FOR PUBLICATION

No. 122,901

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FREDRICK J. LEMONS JR.,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed April 2, 2021. Affirmed.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Thomas R. Stanton*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE, J., and MCANANY, S.J.

PER CURIAM: Fredrick J. Lemons Jr. appeals the district court's denial of his K.S.A. 60-1507 motion alleging ineffective assistance of counsel. Lemons was convicted of aggravated kidnapping, aggravated robbery, aggravated burglary, two counts of aggravated battery, and criminal threat related to an early morning home invasion in May 2015. He now claims that his trial counsel was ineffective for failing to admit messages from Facebook at his trial and for failing to include the messages as evidence at the hearing on a motion for new trial. Lemons asserts that the Facebook messages would have showed he was not involved in the home invasion and could not have committed the crimes. He also claims, for the first time on appeal, that his trial counsel was ineffective

1

for filing the motion for new trial based on a newly discovered evidence theory instead of an "in the interest of justice" theory. For the reasons explained in this opinion, we reject Lemons' claims and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

This court summarized the facts of Lemons' case in his direct appeal:

"On the morning of May 14, 2015, at approximately 4 a.m., Brent Rump was awakened in his bedroom by a flashlight shining in his face. He was struck in the face with the butt of a handgun, rolled onto his stomach, and was then hit several more times. He observed three or four men in his bedroom. The men continued to batter Rump while yelling at him not to look at them or he would be killed. The men tied Rump's hands behind his back and then asked him about any drugs, money, or guns in the house. One man stayed with Rump while at least two other men ransacked his house. The men struck Rump several additional times by using one of Rump's own shotguns as well as a baseball bat. The men continuously told Rump they would kill him if he looked at them.

"Rump recalled that one man stayed with him while 'the other two or three were loading stuff up in either my Jeep or in my car. As far as I know anyway.' The intruders located and took two shotguns, televisions, electronics, cash, and credit and debit cards. They demanded Rump give them his personal identification number (PIN) to his debit card and threatened to return and kill him if he gave them the wrong PIN.

"After getting the information they wanted, two of the men moved Rump to his basement. While they forced Rump to the basement, the men repeated the threat that they would kill Rump if he looked at them. The men held a gun to Rump's head and neck, so Rump looked only at the floor during this transfer to the basement. Once in the basement, the men tied Rump's feet together and then tied his hands to his feet. The men found the keys and titles to all of Rump's vehicles, and stole two of his vehicles: a 2007 silver Honda Accord and a burgundy Jeep Grand Cherokee.

"Once Rump heard his garage door open and the men drive away, he was able to untie himself and run out of the house for help. A passing car stopped for him and the driver allowed Rump to use his cell phone to call the police. Police were dispatched to the scene at 4:49 a.m. Rump did not get a good look at the men who came into his home;

2

he reported that their heads and faces were covered with hoodies and blue or black bandannas. Rump described the men to police as having skinny or thin builds. The police immediately began actively looking for Rump's vehicles and issued a 'be on the lookout' with the descriptions and license tag numbers for the Honda and the Jeep.

"A card transaction history for Rump's bank account on the morning of May 14 reveals that, at 5:05 a.m., someone attempted to withdraw $600 from his bank's drive-up automated teller machine (ATM) at 3rd and Elm Streets in Hutchinson. This amount exceeded the bank's daily limit of $250 for cash withdrawals from the account, and a receipt was issued indicating the requested amount exceeded the withdrawal limit. Nine subsequent transactions were attempted in quick succession over the next seven minutes. These transaction attempts met with various results. Ultimately, a request for $100 was successful. This was followed by another successful request for $100. These transactions were video recorded by a camera at the ATM. The video recording showed a silver car pull up to the ATM. The driver's window rolled down to reveal a person in a white or pale yellow hooded sweatshirt. The hood was over the person's head and the yellow light from above the ATM cast a dark shadow under the hood. Some kind of covering over the lower half of the person's face was visible, but the rest of the face was completely dark. Rump later viewed the video but could not identify the person making the transactions.

. . . .

"Approximately 30 minutes before the police were dispatched to Rump's residence, Brittney Larrick woke up in her bedroom at her house on West 6th Avenue in Hutchinson to find that her boyfriend, Dakota Andersen, was not there. She called his cell phone at approximately 4:20 a.m., but he did not answer. She woke up again at approximately 4:45 a.m. to find he had returned. Larrick and Andersen began to argue, and Andersen left the house again around 5:30 a.m. At approximately 6 a.m., Larrick was again awakened to find Andersen and Lemons in her bedroom. Larrick went back to sleep and woke up at approximately 9:15 to get ready for work. At this time, both Andersen and Lemons were asleep on her bed. Larrick noticed a white hooded sweatshirt on her kitchen counter that she did not recall seeing there when she got up earlier that morning.

"Later that morning, Ashley Reed Wilson, a former girlfriend of Lemons', picked him up at Larrick's residence to take him to a doctor's appointment. Lemons was wearing a white hooded sweatshirt and jeans. When the appointment was over, Wilson returned Lemons to the house.

3

"Also that morning, Detective Jamie Schoenhoff of the Hutchinson Police Department located Rump's Jeep and Honda in the parking lot of the Royal Apartments in the 300 block of East 1st Avenue. The vehicles were parked a few spaces apart among the other vehicles in the lot. Schoenhoff communicated his discovery to other law enforcement officers involved with the investigation, and the officers set up surveillance within several blocks around the parking lot. Schoenhoff positioned himself so that he could observe both of Rump's vehicles as well as the traffic coming and going.

"At approximately 1:50 p.m., a woman driving a red Dodge pickup truck approached the apartment parking lot under surveillance from the wrong direction, which attracted Schoenhoff's attention. The truck pulled into the parking lot, and 'a black male hopped out of the passenger side of that vehicle and immediately jumped into the . . . silver Honda Accord.' The man who got out of the truck and into the Honda was later identified as Lemons. Lemons drove straight towards Schoenhoff as he exited the parking lot. Schoenhoff informed the other officers by radio of the development and he then began to follow Lemons in the Honda. Several detectives took turns following the Honda so as to not alert Lemons of their presence.

"Near the intersection of 7th and Main, Lieutenant Robertson and Detective Bryan Rodriguez were in front of the Honda while Detective Sergeant Tyson Meyers was behind it. Robertson and Rodriguez decided to block the Honda between the law enforcement vehicles and activated their emergency lights. Robertson and Rodriguez got out of their vehicle and approached the Honda with their weapons drawn, repeatedly ordering Lemons out of the Honda. Lemons threw the car into reverse and 'rammed' into Meyers' vehicle at approximately 20 miles per hour. The impact disabled Meyers' vehicle. Lemons immediately put his hands up. As Robertson and Rodriguez approached the Honda, and as Meyers attempted to get out of his vehicle, Lemons then 'threw [the Honda] back in drive' and 'fled at a very high rate of speed.'

"At this point, multiple marked police vehicles also began to pursue Lemons. Lemons turned towards Schoenhoff's vehicle on 6th Avenue but then drove down an alley. Schoenhoff followed Lemons and saw him slide to a stop in the dirt of the alley. Lemons exited the Honda and ran back towards Schoenhoff; Lemons then turned into a yard next to Schoenhoff, running into the back door of 312 West 6th Avenue. Schoenhoff saw other officers run into the house behind Lemons. The woman in the red pickup who had dropped Lemons off at the Honda was parked behind this house. Police located

4

Lemons in the house, sprawled out on the living room floor; he said he was unarmed and 'giving himself up.' Lemons was then taken into custody.

"That afternoon, police obtained a search warrant for the home of Larrick and Andersen, where Lemons also was staying. Police found a partially burned title for a vehicle belonging to Rump in a barbeque grill. They also found a set of house keys belonging to Rump in the kitchen trash can. Approximately 3 to 5 feet from the trash can, police found a white hooded sweatshirt on the kitchen counter. The sweatshirt caught the officers' attention because of the images from the ATM video recording from earlier that morning. Police also searched Larrick's vehicle and found an ATM receipt reflecting 'funds not available' from one of the transactions that morning.

"The next morning, Lemons called Larrick from jail. At the beginning of the call, a recording reported that the call would be monitored or recorded. In the recording of that call, Larrick is heard demanding that Lemons tell her what happened the day before. Lemons denied involvement in any crimes. Larrick, however, complained to Lemons, in detail, that she knew he 'wrecked the cop car,' that her house was raided, and that the police found evidence such as the ATM receipt in her car and other items in the house such as the burned car title, keys, and a white sweatshirt. Lemons asked about Andersen, and Larrick informed him that Andersen 'is long gone.' At that point, Lemons got Andersen's phone number from Larrick and then ended the call.

"Lemons then immediately called Andersen, who was 'on the run' from police. Lemons and Andersen discussed the events from the previous day in varying detail while intermittently denying involvement to each other. Lemons told Andersen that the police 'found everything,' such as the burned title and the keys, and he then told Andersen to call the police and tell them he was not involved in the crimes.

"The police ultimately towed Rump's Jeep back to his house, but the keys were not returned. Rump also got his Honda back but in a substantially damaged condition. Rump noticed items in the Honda that were not his, such as a Texas baseball cap. Rump called the police and asked them to retrieve the cap.

"The State charged Lemons with numerous crimes, including aggravated kidnapping, aggravated robbery, aggravated burglary, two counts of aggravated battery, and criminal threat. At trial, the State called numerous witnesses who presented the above-described evidence to the jury. The State also presented forensic analysis of the white hooded sweatshirt that yielded DNA from two individuals. One contributor was not substantial enough to develop a profile. The other contributor was a probable match to

Lemons. The Texas ball cap yielded three profiles, two of which were smaller unknown contributors, but the larger contributor profile was consistent with Lemons.

"Lemons did not testify at the trial. However, Jordan Leffel, a friend of Lemons' since childhood, testified that Lemons was not involved in the home invasion or other crimes involving Rump. Leffel testified that he committed the crimes, along with Andersen and Brendan Jones. On cross-examination, Leffel acknowledged that he was convicted prior to Lemons' trial for being involved with the Rump home invasion and sentenced to over 19 years in prison. Leffel also admitted sending messages to his mother the evening before Lemons' trial was to begin, asking for her assistance in convincing some of Lemons' girlfriends to put $100 on his 'books' in prison in exchange for his testimony. However, Leffel testified that no one ever gave him any money and he decided to testify anyway because it was the right thing to do.

"After deliberations, the jury found Lemons guilty as charged. On April 22, 2016, the district court sentenced Lemons to a controlling term of 272 months in prison." *State v. Lemons*, No. 116,708, 2018 WL 2272592, at *1-3 (Kan. App. 2018) (unpublished opinion).

*Lemons' direct appeal*

In his direct appeal, Lemons first argued that the evidence was insufficient to convict him of the crimes related to the home invasion. This court disagreed, finding sufficient evidence tied Lemons to the crimes based on the home invasion. 2018 WL 2272592, at *4-5.

Relevant to this appeal, Lemons also challenged the district court's denial of his motion for new trial based on newly discovered evidence of Facebook messages between Lemons and his girlfriend, which he claimed showed he was not involved in the home invasion and could not have committed the crimes. The district court had found the messages were neither newly discovered nor material. Lemons did not include the Facebook messages with his motion to the district court or include them in the record on appeal. Thus, this court pointed out that it was reasonable for the district court to find that Lemons did not establish the messages would have changed the result of the trial. This

court also stated the messages did not constitute newly discovered evidence because Lemons was aware of the messages before trial and should have been able to produce them. Thus, this court affirmed Lemons' convictions. 2018 WL 2272592, at *6.

*K.S.A. 60-1507 proceedings*

On August 16, 2019, Lemons filed a pro se K.S.A. 60-1507 motion, arguing ineffective assistance of trial counsel for (1) failing to present a complete defense by not obtaining and admitting the Facebook messages at trial and (2) failing to request a lesser included offense instruction. Lemons' argued that the Facebook messages, which were between Lemons and Angela Foster, would have proved he was not involved in the crimes because the time stamps showed he was sending and receiving messages during the time he was alleged to be committing the crimes. After the district court appointed Lemons' counsel, he filed an amended K.S.A. 60-1507 motion, also claiming ineffective assistance of appellate counsel for failing to include the messages in the record on appeal when arguing the district court erroneously denied Lemons' motion for a new trial.

The State moved to dismiss, arguing that any issue related to the Facebook messages was barred by res judicata because the appellate court ruled the messages were immaterial. The State contended that this finding would preclude Lemons' from showing prejudice under an ineffective assistance of counsel claim.

On February 24, 2020, the district court held a hearing on Lemons' K.S.A. 60-1507 motion and the State's motion to dismiss. Lemons' trial counsel, Christine Jones, testified that Lemons informed her about the messages before the trial, but he was unable to provide her copies of the messages because Lemons could not use social media while in jail and no one had Lemons' password to access his Facebook. Jones stated that her investigator tried to get copies of the messages from Foster, but Foster did not give them to Jones until after the verdict. Jones testified that it was "conceivable" that the messages

7

would have produced a different outcome at trial had she been able to present them. But she admitted that the messages could not prove Lemons' location because Facebook can be accessed anywhere. For this reason, Jones questioned whether she would not have been able to lay a foundation to introduce the messages into evidence at trial. Finally, Jones conceded that she had the Facebook messages before the hearing on the motion for new trial, but she did not try to introduce the messages into evidence at that hearing.

Lemons testified that he did not give Jones his password because Facebook requested a photo identification to activate his account and he did not have a photo identification. He stated that he told Jones about the activation issue. Lemons testified that his Facebook account could have been accessed with a subpoena, but that Jones did not try to take this action.

After hearing the evidence, the district court granted the State's motion to dismiss, finding the Facebook messages issue was not an ineffective assistance of counsel claim and instead was a newly discovered evidence claim. In the alternative, the district court also stated that it found Jones was not ineffective because the district court found her testimony about trying to get the messages credible. Finally, the district court found that the messages could not prove Lemons was at a different location during the crimes, so introduction of the evidence would not have changed the outcome of the trial. Lemons timely appealed the district court's judgment.

ANALYSIS

On appeal, Lemons claims the district court erred in denying his K.S.A. 60-1507 motion because it incorrectly considered his motion as based on newly discovered evidence rather than a motion for ineffective assistance of counsel. Lemons argues that Jones was ineffective for failing to obtain the Facebook messages as evidence before the trial through subpoena and for failing to introduce the messages as evidence at the

8

hearing on the motion for new trial. As for prejudice, Lemons argues that "[i]f the messages were able to show that a personal conversation was going on through Facebook . . . at the exact same time as the ATM transaction, it very well could have created the reasonable doubt needed to acquit Lemons."

Lemons does not renew his claim in district court that his trial counsel was ineffective for failing to request a lesser included offense instruction. He also does not renew his claim of ineffective assistance of appellate counsel. Issues not briefed are deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

The State argues that Jones was not ineffective because Lemons failed to cooperate with Jones in providing the Facebook messages before trial. The State also points out that Jones testified she had no way to establish an alibi with the Facebook messages, and the district court and appellate court had determined as much when they found the messages were immaterial.

When the district court holds an evidentiary hearing on a K.S.A. 60-1507 motion, this court applies a two-step review process. First, this court reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Second, this court conducts a de novo review of the district court's ultimate conclusions of law. *Fuller v. State*, 303 Kan. 478, 485-86, 363 P.3d 373 (2015).

The Sixth Amendment to the United States Constitution, as applied to the states under the Fourteenth Amendment, guarantees that in criminal prosecutions the accused has the right to effective assistance of counsel. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). An ineffective assistance of counsel claim based on deficient performance is subject to the *Strickland* test. *Sola-Morales*, 300 Kan. at 882 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

9

The *Strickland* test requires Lemons to show that (1) the performance of trial counsel was deficient and (2) the deficient performance prejudiced him, "*i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance." See *Sola-Morales*, 300 Kan. at 882 (citing *Strickland*, 466 U.S. at 687).

In analyzing a claim for ineffective assistance of counsel, there is a strong presumption that counsel's conduct was adequate and that counsel made decisions within the exercise of reasonable professional judgment. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Although the *Strickland* test contains two prongs, this court can resolve Lemons' appeal by focusing on the second prong: whether Jones' allegedly deficient performance prejudiced Lemons' defense. See *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *Sola-Morales*, 300 Kan. at 886 (doing so).

*Trial counsel did not provide ineffective assistance of counsel in relation to failing to admit the Facebook messages at trial.*

To begin, Lemons complains that the district court erroneously ruled on his motion as an issue of newly discovered evidence and thus "begged the question" of whether Jones was ineffective. While Lemons is correct that the district court stated it believed the issue was not an ineffective assistance of counsel argument, it still discussed the ineffective assistance of counsel claim and made appropriate findings. The district court found Jones' testimony about her efforts to obtain the messages credible and found Lemons' testimony about his inability to provide the messages not credible. The district court then stated that Jones testified she had no way to establish Lemons' location by admitting the Facebook messages, and Lemons could not show prejudice by Jones' failure to obtain and admit the messages at trial. Thus, the district court did address whether Lemons' counsel was ineffective in relation to the Facebook messages.

10

The district court correctly denied Lemons' motion because he could not show that he was prejudiced by Jones' failure to obtain and admit the Facebook messages at trial. Lemons' claimed in his K.S.A. 60-1507 motion that the Facebook messages, which again were not included in his motion or in the record on appeal, showed that he was actively sending and receiving messages on Facebook during the time he was allegedly committing the crimes. He asserted that the messages are first time stamped on May 14, 2015, at 3:18 a.m., and the messages continue for about two hours, with the last time stamped message at 5:37 a.m. He pointed out that one message is time stamped at 5:10 a.m., the exact time the State alleged he was withdrawing money from the ATM, and the ATM video did not show the person typing on a cell phone.

Even assuming the messages were sent at the times stated by Lemons, including one at 5:10 a.m., the messages would not establish that he was not the one at the ATM. Testimony at trial showed that the ATM withdrawals occurred from 5:05 a.m. until 5:12 a.m., with two at 5:10 a.m. Surveillance video from the drive-up ATM showed a car pull up to the ATM with the driver rolling down the window and completing the transaction. In the footage, the driver's face was partially obscured because of shadows and a face covering. Because the ATM was a drive-up ATM, the cell phone could have been in the car or Lemons' lap and would not have been visible to the camera. And although Lemons claims one message was time stamped at 5:10 a.m. he does not assert that he sent that message. Instead, that message could have been a message he received at 5:10, meaning he would not have to be typing on the phone at that time. Thus, even assuming the messages show what Lemons' claims, he has not established a reasonable probability that he was not the one at the ATM.

More importantly, as Jones pointed out in her testimony, even if she had introduced the messages into evidence at trial, which she did not think she could do, the messages would not prove Lemons was not at the ATM or involved in the home invasion because the messages could not establish his location. Lemons does not acknowledge or

11

challenge this assertion. In sum, Lemons fails to show a reasonable probability that the jury would have reached a different result if Jones had admitted these messages. Because he cannot establish prejudice, his ineffective assistance of counsel claim fails.

As for Lemons' claim that Jones was ineffective for failing to include the messages as evidence at the hearing on the motion for new trial, Lemons does not assert how admitting the messages would have changed the district court's decision to deny the motion. At the hearing, Lemons advanced the same argument, claiming that the messages show a conversation from about 3:30 a.m. until 5:30 a.m. and the ATM footage did not show the person on the phone. The district court heard this argument and denied the motion, finding the evidence would not have had a material effect on the verdict. Lemons does not assert how he was prejudiced by Jones' failure to introduce the messages at the hearing or how the actual messages would have changed the district court's ruling. Thus, the district court did not err in denying Lemons' K.S.A. 60-1507 motion.

*Lemons' claim for ineffective assistance of counsel raised for the first time on appeal fails as a matter of law.*

At the end of his brief, Lemons argues for the first time on appeal that Jones was ineffective for filing the motion for new trial based on newly discovered evidence and instead should have filed the motion based on an "in the interest of justice" theory. The State argues that Lemons is improperly raising this issue for the first time on appeal and this court should consider it waived.

This court generally will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal. *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019). "'[G]enerally the factual aspects of a claim of ineffective assistance of counsel require that the matter be resolved through a K.S.A. 60-1507 motion or through a request to remand the issue to the district court for an evidentiary hearing.'" 309 Kan. at

483. But we may consider a claim of ineffective assistance of counsel for the first time on appeal when there are no factual issues and the ineffective assistance of counsel test can be applied as a matter of law based on the record. 309 Kan. at 483-84.

Lemons neither acknowledges that he raises this issue for the first time on appeal nor does he assert that we can hear the issue for the first time on appeal. For that reason alone, we could deny the claim as improperly preserved. See *State v. Godfrey*, 302 Kan. 1041, 1044, 350 P.3d 1068 (2015). In any event, we can dispose of this claim because Lemons fails to argue the prejudice prong of the ineffective assistance of counsel test.

The district court can grant a new trial "if required in the interest of justice." K.S.A. 2020 Supp. 22-3501(1). The statute also explains that a motion for new trial can be based on newly discovered evidence. K.S.A. 2020 Supp. 22-3501(1). Jones filed a motion for new trial based on newly discovered evidence. Lemons now asserts Jones should have argued that a new trial was required "in the interest of justice." But he does not explain what such an argument would have been or how the argument would have differed from the one made by Jones at the hearing. He also does not assert, let alone argue, that had Jones advanced such an argument there would have been a reasonable probability that the district court would have granted the motion for a new trial. Because Lemons does not identify any prejudice suffered by Jones' failure to raise such an argument, his ineffective assistance of counsel claim fails as a matter of law.

Affirmed.

13